**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Case No. 25-cr-00457-NEB-EMB |
| Plaintiff, | |
| v. | **REPORT AND** |
| | **RECOMMENDATION** |
| Jeffrey Josuee Lopez-Suazo, | |
| Defendant. | |

Before the Court are two competing motions to dismiss the indictment. Both parties agree the indictment should be dismissed because noncitizen Defendant Jeffrey Josuee Lopez-Suazo has been removed from the country. But Mr. Lopez-Suazo seeks dismissal with prejudice (Dkt. No. 25), while the Government seeks dismissal without prejudice (Dkt. No. 28). After considering the motions pursuant to 28 U.S.C. § 636 and Local Rule 72.1(a)(3)(A), I recommend the indictment be dismissed without prejudice.

## I.      Factual Background

The Government initiated this action by filing a criminal complaint on November 25, 2025, charging Mr. Lopez-Suazo with one count of assaulting and impeding an Immigration and Customs Enforcement ("ICE") officer in violation of 18 U.S.C. § 111(a). (*See* Dkt. No. 1.) As set forth in the

supporting affidavit, an ICE officer claimed Mr. Lopez-Suazo "intentionally struck [the officer's] vehicle in an attempt to get away."  (Dkt. No. 1-1 ¶ 9.)

The Court scheduled a detention hearing for December 3 and ordered Mr. Lopez-Suazo to be preliminarily detained by the United States Marshal Service ("USMS") pending that hearing.  (*See* Dkt. Nos. 7, 9.)  The day before the detention hearing, the grand jury returned an indictment charging Mr. Lopez-Suazo with one count of assaulting and impeding a federal officer, and a second count of improper entry, in violation of 8 U.S.C. § 1325(a).  (Dkt. No. 12.)  After the December 3 detention hearing, Mr. Lopez-Suazo was released on a personal recognizance bond with conditions.  (Dkt. Nos. 14, 16–17.)

Nevertheless, Mr. Lopez-Suazo was transported back to Sherburne County Jail in USMS custody that same day.[1]  (Dkt. No. 25-1 ¶ 2.)  A jail representative confirmed that Mr. Lopez-Suazo remained in federal criminal custody (i.e., as a USMS inmate rather than one in ICE custody) through

---

[1] Defense counsel Kate Adams submitted a sworn declaration in support of Mr. Lopez-Suazo's motion.  (*See* Dkt. No. 25-1.)  The Government did not submit a competing affidavit, nor did it challenge Ms. Adams's version of events, either in its responsive briefing or at the hearing.  I accept the credible, unchallenged factual assertions set forth in Ms. Adams's declaration to be true.  *See United States v. Adams*, 777 F. Supp. 3d 185, 208 (S.D.N.Y. 2025) ("[C]ourts have looked beyond the four corners of the motion to consider the entire record before the court—occasionally even conducting hearings—to determine if dismissal [under Rule 48(a)] is warranted.").

December 4. (*Id.*) On December 5, a Sherburne County Jail official confirmed Mr. Lopez-Suazo had been "switched" to ICE custody. (*Id.*)

Mr. Lopez-Suazo's attorney, Assistant Federal Public Defender Kate Adams, quickly became "unable to locate [him]" after this switch to ICE custody. (*Id.* ¶ 3.) She couldn't reach him on his tablet or find him on the ICE detainee locator website. (*Id.*) Ms. Adams confirmed through another attorney that "Mr. Lopez-Suazo had been taken out on a bus with other inmates" on the morning of December 8. (*Id.*) Despite that confirmation, "[t]he ICE detainee locator website continued to return no results related to Mr. Lopez-Suazo." (*Id.*)

Ms. Adams called ICE's Fort Snelling field office that same day and learned "Mr. Lopez-Suazo had been removed from the Sherburne County Jail in ICE custody and was at that time in transport to the area of Harlingen, Texas." (*Id.* ¶ 4.) The ICE representative couldn't provide a reason for the transfer but noted "it was 'unusual' in his experience that the internal ICE system" did not specify which of the five Harlingen-area detention facilities would house Mr. Lopez-Suazo. (*Id.*)

That same day, December 8, Ms. Adams called all five of the Harlingen-area detention facilities but "was unable to get any additional information about Mr. Lopez-Suazo's whereabouts." (*Id.* ¶ 5.) Some of the phone numbers listed on the ICE website "rang to disconnected numbers—

3

specifically, automated messages provided that the number was out of service," while others contained "options [that] were not operational to get through to talk to any person." (*Id.*)

The next day, the ICE locator finally indicated Mr. Lopez-Suazo was being detained at the Port Isabel Processing Center—one of the facilities Ms. Adams had attempted to contact the day before. (*Id.* ¶ 6.) Despite calling the facility contact number listed on ICE's website, Ms. Adams "was unable to reach anyone by phone." (*Id.*) She created an online account through the "Access Corrections" website the next day and attempted to contact Mr. Lopez-Suazo through electronic means. (*Id.*) That, too, failed because Mr. Lopez-Suazo's account didn't accept phone calls or messages, but "only allowed for financial deposits." (*Id.*)

About a week after that, on December 15, the Government provided discovery consisting of one police report and seven images. (Dkt. No. 25 at 6.) The Government did not provide any discovery related to the illegal entry charge (e.g., Mr. Lopez-Suazo's A-file or other immigration paperwork). Ms. Adams made additional discovery requests, including requests to inspect the ICE officer's vehicle and its "black box" data, which would have recorded details about the accident. (*Id.*) Despite these specific requests, the Government simply replied, "there is nothing else to disclose." (*Id.*)

4

On December 19, an immigration attorney also representing Mr. Lopez-Suazo faxed the Harlingen ICE office with "a request for immediate removal and [a] stipulat[ion] that he would consent to removal without first seeing an Immigration Judge." (*Id.* ¶ 7.) It's not abundantly clear when Mr. Lopez-Suazo first expressed a desire to consent to deportation, but it's clear he did so by at least December 19.

On December 22, Ms. Adams sent the Government video footage of the accident. Because of her office's independent investigation, Ms. Adams learned there were four cameras at the intersection where the accident occurred, two of which captured video of the collision. The Government did not independently seek this footage.[2]

I also held a status conference on December 22. (*See* Dkt. No. 21.) Mr. Lopez-Suazo did not appear at the status conference because ICE had moved him out of Minnesota. The Government claimed Mr. Lopez-Suazo was supposed to be back in time for the status conference, but he had not been put on his initially scheduled flight. The Government further represented that Mr. Lopez-Suazo was scheduled to arrive on a different flight on

---

[2] At the hearing, the parties disagreed about whether this footage favors Mr. Lopez-Suazo or the Government. The content of this footage, which I have not seen, is not relevant to the issue before me.

December 26.  The Government conveyed its understanding that Mr. Lopez-Suazo would then remain in Minnesota for the pendency of this case.

Despite Mr. Lopez-Suazo's December 19 consent to removal, ICE transported him back to Freeborn County Jail in Albert Lea, Minnesota.  He arrived by December 26.  (Dkt. No. 25-1 ¶ 8.)  At that point, "Mr. Lopez-Suazo had not yet been provided a Notice to Appear; had not met with an ICE officer; and had not yet appeared before an Immigration Judge."  (*Id.*)  Mr. Lopez-Suazo and his immigration attorney continued "making efforts to effectuate his deportation."  (*Id.*)

Ms. Adams "again endeavored to meet with Mr. Lopez-Suazo" on January 8, 2026, because she "believ[ed] that no progress had been made towards [his] deportation."  (*Id.* ¶ 9.)   She began by calling the phone number listed on ICE's website, but that "number was out of service."  (*Id.*)  She then called the Freeborn County Jail.  A jail representative explained that attorneys wishing to visit individuals detained in ICE custody must follow a three-step process:

> (1) the attorney should contact ICE at a phone number provided;
> (2) ICE would then contact the Freeborn County Jail, likely by e-mail, to provide the attorney's name as an approved contact;
> (3) the attorney would then be able to call back the Freeborn County Jail, on the same number, and schedule an attorney visit.

(*Id.*)

The next day, Ms. Adams attempted to follow this procedure by contacting ICE through the number that Freeborn County Jail officials had provided. (*Id.* ¶ 10.) That number rang to an automated phone system for ICE, which included an option for those "calling about someone in custody." (*Id.*) Ms. Adams selected this option and asked to be added as one of Mr. Lopez-Suazo's approved contacts. (*Id.*) The ICE representative "denied having ever heard of this approval system" and told Ms. Adams she "should be free to visit an individual without such approval." (*Id.*) When she asked the representative to "inform the Freeborn County Jail" about this discrepancy, he declined and said, "I just work the property room, I don't know why all these calls get directed to me." (*Id.*)

Despite Ms. Adams's heroic attempts at contact, Mr. Lopez-Suazo argues the lack of access to his counsel has violated his Fifth and Sixth Amendment rights to counsel and to participate in his defense. (Dkt. No. 25 at 9.)

At some point, Mr. Lopez-Suazo was removed from the United States.

## II.   The Government's Motion

I consider the Government's Motion under Federal Rule of Criminal Procedure 48(a) first. If there are insufficient grounds to deny the Rule 48 motion, Defendant's alleged rights violations are moot.

Federal Rule of Criminal Procedure 48(a) provides that "[t]he government may, with leave of court, dismiss an indictment, information, or complaint." District courts typically only deny leave to dismiss an indictment in "the rarest of cases." *United States v. Bernard*, 42 F.4th 905, 909 (8th Cir. 2022) (quoting *In re Richards*, 213 F.3d 773, 786 (3d Cir. 2000)). Denial of leave may be appropriate in two scenarios: "when the defendant objects to the dismissal, [or] when dismissal is clearly contrary to the manifest public interest." *United States v. Jacobo-Zavala*, 241 F.3d 1009, 1012 (8th Cir. 2001). A dismissal is clearly contrary to the manifest public interest only if "the prosecutor . . . had an illegitimate motive rising to the level of bad faith." *Bernard*, 42 F.4th at 909. Examples of bad faith "include the acceptance of a bribe, personal dislike of the victim, and dissatisfaction with the jury impaneled." *Id.* (quoting *United States v. Smith*, 55 F.3d 157, 159 (4th Cir. 1995)). "Anything less is not enough." *Id.* (citing *In re United States*, 345 F.3d 450, 453 (7th Cir. 2003)).

If neither of these scenarios are present, the Government's Rule 48(a) motion should be granted, and the dismissal should, generally, be without prejudice. *United States v. Garcia-Lopez*, 25-437 (DWF/LIB), 2026 WL 331200, at *1 (D. Minn. Feb. 6, 2026) (citing *United States v. Oliver*, 950 F.3d 556, 562 (8th Cir. 2020)). In *Oliver*, the Eighth Circuit acknowledged it was bound by its prior cases, which dismissed without prejudice. *See* 950 F.3d at

8

562 (citing *DeMarrias v. United States*, 487 F.2d 19, 21 (8th Cir. 1973) (per curiam) and *United States v. Arradondo*, 483 F.2d 980, 983 (8th Cir. 1973) ("Rule 48(a) . . . permits dismissal of an indictment by leave of court. Such dismissal is without prejudice.")). However, if the Government's purpose in dismissal is prosecutorial harassment, dismissal should be with prejudice. *See United States v. Feldhacker*, 849 F.2d 293, 295 (8th Cir. 1988).

Because neither of the limited circumstances for denying the Government's motion altogether are present and because there is no evidence of prosecutorial harassment, I recommend the indictment be dismissed without prejudice.  First, Mr. Lopez-Suazo doesn't oppose dismissal—he seeks the same relief.

Second, nothing in the record suggests the prosecutors have acted with the requisite bad faith.  The Government seeks dismissal because Mr. Lopez-Suazo has been removed from the country, and it does not want to waste judicial resources by "litigating issues that are unlikely to bring the case to resolution."  (Dkt. No. 28 at 2.)  It also argues the Court should not infer bad faith from the simultaneous prosecution and removal proceedings.  (*Id.* at 2–3 (citing *United States v. Pacheco-Poo*, 952 F.3d 950, 952–53 (8th Cir. 2020)). Finally, it claims that it is not seeking dismissal to harass Mr. Lopez-Suazo because "[a]ny re-charging almost certainly would be prompted by the

intervening circumstance of the commission of a new crime." (*Id.* at 3 (citing *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977) (per curiam)).

At the December 22 status conference, counsel for the Government conveyed her understanding that ICE would transport Mr. Lopez-Suazo back to the District of Minnesota, and he would remain here until the criminal charges were resolved. Although she was unsure why he wasn't transported back in time for the status conference, she explained that his travel was rescheduled for arrival on December 26th. Indeed, he arrived back in the district—albeit in Albert Lea—by that date. Accordingly, the record supports the conclusion that prosecutors had no improper motive, despite Mr. Lopez-Suazo's eventual removal.

In short, there is no basis upon which to deny the Government's motion to dismiss the indictment without prejudice under Rule 48(a). And because such dismissals should be without prejudice, I recommend the Government's motion be granted, and the indictment be dismissed without prejudice

### III.   Mr. Lopez-Suazo's Motion

Mr. Lopez-Suazo urges the Court to dismiss the indictment with prejudice. Although he filed his motion first, Mr. Lopez-Suazo has not presented any authority suggesting the Court can turn a blind eye to the Government's subsequently filed Rule 48(a) motion. That is, he provides no legal authority discussing the interplay between his request and the

10

Government's request. Even though I don't find grounds to deny the Government's motion to dismiss under Rule 48, I consider Mr. Lopez-Suazo's request independently. For the following reasons, I conclude dismissal with prejudice is not warranted in this case.

At the hearing, Ms. Adams explained she was seeking dismissal pursuant to the Court's inherent supervisory authority. A district court may dismiss a criminal indictment pursuant to "its supervisory power to: (1) implement a remedy for violation of recognized rights; (2) preserve judicial integrity; or [3] deter illegal or improper conduct." *United States v. Montoya-Salazar*, 23-CR-88 (NEB/DJF), 2023 WL 4998535, at \*1 (D. Minn. May 31, 2023) (citing *United States v. Hasting*, 461 U.S. 499, 505 (1983)), *report and recommendation adopted as modified,* 23-CR-88 (NEB/DJF), 2023 WL 4456880 (D. Minn. July 11, 2023). But this type of dismissal "is 'a drastic remedy' requiring a showing that the government engaged in 'a systematic and persistent abuse of power.'" *United States v. Adams*, 17-CR-00064 (DWF/KMM), 2018 WL 6991106, at \*27 (D. Minn. Sept. 17, 2018) (quoting *United States v. Solomon*, 679 F.2d 1246, 1253 n.12 (8th Cir. 1982)). Such dismissals exist only "for truly extreme cases" and "require[] a showing of prejudice." *Id.* (quotations and citations omitted).

None of the three justifications are present here. First, to the extent continued prosecution would violate Mr. Lopez-Suazo's constitutional rights,

11

"[d]ismissal of this matter on the Government's motion resolves" those concerns. *See Garcia-Lopez,* 2026 WL 331200, at \*2 & n.1 (granting Rule 48(a) dismissal without prejudice but noting that questions about "whether there could be a fair trial on these charges in the future" may "make reviving these charges impossible"). However, if this case continued, Defense Counsel lays out a series of events that might well violate Mr. Lopez-Suazo's Fifth and Sixth Amendment rights to counsel and to participate in his defense.

Second, there is no argument that dismissal is required to preserve judicial integrity. Although the Court expended resources that ultimately proved to be for naught due to Mr. Lopez-Suazo's removal, the dual pursuit of removal and prosecution is permissible, as explained below, and does not undermine judicial integrity.

Third—notwithstanding the executive branch's "baffling decision[]" to return Mr. Lopez-Suazo to Minnesota just to turn around and deport him to Honduras—there is not sufficient evidence to conclude the Government has engaged in improper or illegal conduct. *United States v. Villatoro-Ventura,* 330 F. Supp. 3d 1118, 1141 (N.D. Iowa 2018). In his brief, Mr. Lopez-Suazo cites several out-of-circuit decisions that found ICE either did or would act improperly by detaining a defendant under the Immigration and Nationality Act ("INA") after he had been released pursuant to the Bail Reform Act ("BRA"). (*See* Dkt. No. 25 at 7–8 (citing *United States v. Trujillo-Alvarez,* 900

F. Supp. 2d 1167, 1180-81 (D. Or. 2012); *United States v. Parias*, 25-cr-00904-FMO, 2025 WL 3749406 (C.D. Cal. Dec. 27, 2025); *United States v. Boutin*, 269 F.Supp.3d 24, 26 (E.D.N.Y. 2017); *Villatoro-Ventura*, 330 F.Supp.3d at 1141).)

But the executive branch may pursue both removal proceedings and criminal charges without committing to a single course of action. *Pacheco-Poo,* 952 F.3d at 952–53. As Defense Counsel conceded at the hearing, the removal order I issued in this case did not prevent ICE from detaining Mr. Lopez-Suazo for purposes of removal. *See id.* at 952 ("The BRA and INA regulate different entities and functions. The BRA regulates a judicial officer's pretrial release of federal criminal defendants. The INA governs the Attorney General's removal of aliens."). Instead, Counsel argues *Pacheco-Poo* does not control here because ICE detained Mr. Lopez-Suazo "not [to] pursue his removal from the country, but instead to hold him for the purposes of this criminal proceeding." (Dkt. No. 25 at 9.)

This argument has some record support. For example, Mr. Lopez-Suazo was not properly "switched" from USMS custody after I ordered him released on December 3—it took until December 5. Similarly, ICE's choice to move Mr. Lopez-Suazo from Texas to Albert Lea could support a conclusion that ICE was improperly holding Mr. Lopez-Suazo on behalf of the Department of Justice. The Government speculated this trip may have been a

detour on removal proceedings because of bed space or other logistics.  Mr. Lopez-Suazo speculated ICE was improperly detaining him for purposes of prosecution to contravene the release order.  It's not clear either way.  There is not enough in the record to conclude these government actions were intentional and the result of "a systematic and persistent abuse of power."[3] *Adams*, 2018 WL 6991106, at \*27.

Finally, Mr. Lopez-Suazo points out that the executive branch did not seem particularly interested in pursuing prosecution in this case.  To be sure, it does not appear prosecutors aggressively investigated or diligently prepared to prove the Government's case beyond a reasonable doubt— particularly with respect to the illegal entry charge.  Likewise, it appears the executive branch's attempts at removal were also suboptimal.  If it planned to remove him, why did ICE move Mr. Lopez-Suazo back from Texas to Minnesota *after* he had stipulated to removal to Honduras?  The Government couldn't say.  But the conduct in this case is not so egregious that it necessarily evidences a nefarious intent as opposed to something more pedestrian, like inattention or ineptitude.  I've been unable to locate authority suggesting I can decline to give the executive branch the benefit of

---

[3] I acknowledge the difficulty in requiring Mr. Lopez-Suazo to come forth with evidence of the Government's motivation.  But he does not provide any legal support for the idea that the Government's failure to produce evidence on this point satisfies the relevant legal framework.

14

the doubt here. However, continued executive branch disorganization and failure to dedicate adequate resources to proceedings, both criminal and immigration, could rise to the level of "a systematic and persistent abuse of power" in future cases.

Because the record does not evidence the type of extreme conduct that warrants invocation of the Court's inherent supervisory authority, I recommend Mr. Lopez-Suazo's motion be denied to the extent it seeks dismissal with prejudice.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED THAT:

1.  Defendant's Motion to Dismiss (Dkt. No. 25) be GRANTED with respect to dismissal but DENIED to the extent it seeks dismissal with prejudice;

2.  The Government's Motion to Dismiss Indictment (Dkt. No. 28) be GRANTED; and

3.  The indictment (Dkt. No. 12) be DISMISSED without prejudice.

Date: February 18, 2026

*s/Elsa M. Bullard*
ELSA M. BULLARD
United States Magistrate Judge

15

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).